## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ARLENE LOVE, individually and as Independent Administrator of the Estate of DEREK LOVE, Deceased, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | No. 18 C 2742 |
| v. | ) ) | |
| | ) | Judge Sara L. Ellis |
| CITY OF CHICAGO, a municipal corporation; Officer DAVID BENITEZ #12678, individually and as an agent of Defendant, CITY OF CHICAGO; Officer JUAN RIVERA #17308, individually and as an agent of Defendant, CITY OF CHICAGO; and Officer ALFONSO HERRERA #14777, individually and as an agent of Defendant, CITY OF CHICAGO, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

On July 21, 2016, Derek Love died after an encounter with Chicago Police Officers

David Benitez, Juan Rivera, and Alfonso Herrera (collectively, the "Defendant Officers").

Love's sister, Arlene Love, the administrator of his estate (the "Administrator"), filed this case

against the Defendant Officers and the City of Chicago. In her first amended complaint, she

brings wrongful death and survival claims for willful and wanton conduct against the Defendant

Officers and the City (Counts I–VIII). She also raises federal claims for excessive force against

the Defendant Officers (Count IX) and *Monell* claims against the City for failure to train and

investigate, and for the perpetuation of a code of silence (Counts X and XI). The Defendant

Officers and the City have separately filed motions for summary judgment. Because the record

does not create a genuine dispute as to whether the Defendant Officers unreasonably used deadly

force, the Administrator cannot prevail on any of her claims and so the Court enters judgment for the Defendant Officers and the City.

## BACKGROUND[1]

On July 21, 2016, the Defendant Officers were working as uniformed bicycle patrol officers out of the First District on the 3:00 p.m. to midnight shift. Benitez carried a .40 caliber Glock handgun and wore a CPD shirt, bulletproof vest, duty belt, and shorts. Benitez, who is right-handed, carries his gun on his right side and shoots with his right hand. Herrera carried a .9 mm Sig Sauer handgun and wore a short-sleeved police shirt, bicycle pants, bulletproof vest, and a duty belt that held his gun, handcuffs, and magazine. Rivera also carried a .9 mm Sig Sauer handgun and wore a bike uniform, bulletproof vest, and a duty belt containing his gun and holster, handcuffs, a radio, and a baton. None of the Defendant Officers wore body cameras that day, and their bicycles also did not have any cameras on them.

That evening, the Defendant Officers had worked to clear concertgoers from a cancelled concert at Northerly Island due to an incoming thunderstorm. On their way back to the First District Station at 1718 South State Street, while on 18th Street between Calumet and Prairie,

---

[1] The Court derives the facts in this section from the Joint Statements of Undisputed Material Facts, the Administrator's additional statements of fact, the Defendant Officers' and the City's replies, and the exhibits attached to each. In connection with their summary judgment motions, the parties filed *Daubert* motions to exclude certain opinions proffered by their opponents' retained experts. For purposes of resolving the pending motions for summary judgment, however, the Court treats the challenged experts' opinions as admissible. The Court has included in this background section only those portions of the statements and responses that are appropriately presented, supported, and relevant to resolution of the pending motions for summary judgment. The Court takes all facts in the light most favorable to the Administrator, the non-movant.

The parties filed some exhibits under seal. When the Court refers to a sealed document, it attempts to do so without revealing any information that could reasonably be deemed confidential. Nonetheless, if the Court discusses confidential information, it has done so because it is necessary to explain the path of its reasoning. *See City of Greenville v. Syngenta Crop Prot., LLC*, 764 F.3d 695, 697 (7th Cir. 2014) ("[D]ocuments that affect the disposition of federal litigation are presumptively open to public view . . . unless a statute, rule, or privilege justifies confidentiality." (citation omitted)); *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000) (explaining that a judge's "opinions and orders belong in the public domain").

two women, Amani Abou Harab and Brittany Brownlee, stopped the Defendant Officers. While in the Battle of Fort Dearborn Park, a .47 acre park at 18th and Calumet, with their dogs, Harab and Brownlee observed Love at a bench drinking what they believed to be beer from cans. Love was 5'11", weighed 199 pounds, and was fifty years old at the time. Harab and Brownlee watched as Love paced, drank beer, and repeatedly looked at several school-aged girls playing in the park. Harab and Brownlee became nervous and uncomfortable, and so they decided to leave the park and report their concerns about Love to the police. As they left, Harab also told the girls to leave the park. When they did, Harab and Brownlee heard Love say something similar to "you girls leaving already" or "y'all ladies aren't getting ready to leave now are you?" Doc. 196 ¶ 20. Harab and Brownlee encountered Rivera not far from the park, and told him that they saw a man drinking in the park acting strangely, looking at girls, and making them uncomfortable.

Although the Defendant Officers had not noticed any disturbances when they passed the park several minutes before, they headed back to the Battle of Fort Dearborn Park to investigate Harab and Brownlee's report. The sun had not yet set when they arrived. As they approached the park, the Defendant Officers saw Love, the only person remaining in the park, sitting on the armrest of the middle of three benches with a backpack on the bench next to him. Rivera and Herrera entered the park from the south, while Benitez entered from the north. They stopped in a semicircle facing Love on the middle bench, with Benitez to the north, Rivera in the middle (to the west), and Herrera to the south. Benitez stopped within five feet of Love on the bench, got off his bike, and placed it in front of him. As the Defendant Officers approached Love, they observed him put down a can and place a cellular telephone to his left ear. Herrera thought Love held the phone backwards, with the screen facing out. Both Herrera and Rivera did not think Love was speaking with anyone on the phone. Benitez and Herrera told Love to get off the

telephone.  Love responded, "why what's going on," at which point Benitez again ordered Love off the phone so that the Defendant Officers could talk to him.  Doc. 196 ¶ 34.

Instead of complying, Benitez testified that he saw Love stand up, step to the back area of the bench, and pull a black handgun from the small of his back.  Rivera testified that he saw Love reach to his back and produce a blue steel black semi-automatic handgun.  Herrera testified that he saw Love put the phone down, reach behind his back with his right hand, and pull out a black semi-automatic handgun.  The Civilian Office of Police Accountability ("COPA") Executive Summary of its investigation into the incident[2] reflects that the Defendant Officers relayed to investigators slightly different facts as to the location from which Love pulled the gun: Herrera stated that Love reached over the bag with his right hand and drew a weapon, Benitez stated that Love went into a bag and retrieved a gun, and Rivera stated that Love reached into the small of his back and produced a black gun.[3]  Benitez and Rivera testified that Love held the gun with both hands and had his knees slightly bent as if in a shooting stance.  According to the Defendant Officers, Love pointed the gun first at Benitez, then at Rivera, and then at Herrera, returning back the other way to Benitez in a continuous fanning motion.  When Benitez saw Love with the gun, he unholstered his own gun, took a couple steps back, and told Love to drop the gun.  Rivera also tried to create some distance, unholstered his gun, and told Love to drop the gun.  Herrera walked backwards with his bike, dismounted it, and then unholstered his gun.

---

[2] COPA replaced the Independent Police Review Authority ("IPRA") on September 15, 2017 as the civilian oversight agency for the Chicago Police Department.  IPRA began the investigation into the incident here, but COPA completed it.

[3] The Defendant Officers state that a transcription error occurred in Herrera's IPRA transcript, with the audio making it clear that Herrera told the IPRA investigators that Love reached behind his back for the gun.  *See* Doc. 235 at 3 n.1.  The Defendant Officers do not provide the audio, however, and so the Court cannot confirm the Defendant Officers' representation.

Sarah Sharon and David Mathes-Rothfuss observed the scene from a distance. They testified that they saw Love stand up and raise or point one hand toward the officers. Sharon could not tell whether Love held his arm steady or moved it around. She also testified that she saw Love take an object that she could not identify out of his backpack. Mathes-Rothfuss indicated that he did not see Love holding anything because the Defendant Officers obstructed his view.

A shot went off, hitting Benitez in the left thigh and causing Benitez to fall onto his left knee. In response to the fired shot, each of the Defendant Officers fired their guns at Love simultaneously and in rapid succession. Benitez did not see Love fire, instead believing that Love fired the gun because Love had the gun pointed directly at him when he felt the shot. After the bullet hit him and he fell to the ground, Benitez stood up and fired nine shots at Love. Herrera testified that he saw a muzzle flash from Love's gun and heard a gunshot. Herrera then attempted to fire but his gun malfunctioned and he had to clear a live round first. Once he had done so, Herrera fired at Love while facing north, shooting toward Love's torso. Rivera heard a gunshot and saw Benitez fall, prompting him to fire nine shots at Love. As the officers fired, Love turned to his right and ran north toward the fence at the north edge of the park with the gun in his right hand. Benitez testified that he stopped firing when Love no longer had his gun pointed at Benitez, and Rivera testified that he stopped firing and lowered his gun when he saw Love running north toward the fence. Love managed to jump over the approximately four foot high wrought iron fence, falling to the ground on the other side on his stomach, with his head to the east and his hands under his body. Herrera testified that he stopped shooting at Love when Love jumped over the fence, which stood approximately fifteen to twenty feet from Herrera's location when he started shooting at Love.

Rivera and Herrera pursued Love to the fence, with Rivera then turning around to check on Benitez. Before the two got to the fence, Herrera did not know of Benitez's injury. Rivera radioed for two ambulances, and Benitez also called for help. Rivera used his belt as a tourniquet to stop Benitez's bleeding until other officers arrived and placed Benitez in a police vehicle and took him to Northwestern Hospital.

Meanwhile, Herrera jumped over the fence. He then heard Love say "motherf---ers, motherf---ers." Doc. 196 ¶ 57. Herrera testified that he saw the grip of a gun in Love's right hand and Love making movements with his right arm and hand as if he was trying to get up. Herrera then thought he told Love to show his hands. Herrera testified that he thought Love was trying to fire the gun again, and so he fired one shot at Love's upper right back from five to seven feet away. In his IPRA interview, Herrera acknowledged that the gun in Love's hand was not pointed at him at that time and that he did not know if Love would fire the weapon again.

After this last shot, Herrera testified that he approached Love, handcuffed his right hand, rolled Love over, and observed a black semiautomatic gun on the ground where Love's hands had been. Herrera further testified that he kicked the gun away from Love's body. Other responding officers testified that after shooting Love, Herrera was transfixed on him, continued to train his gun on him, and did not respond to verbal contact from the other officers. These responding officers testified that they could only handcuff one of Love's hands because the other had been nearly severed by gunshot wounds. These other officers also observed a gun near Love's body. None of the responding officers rendered emergency first aid to Love, instead waiting for the paramedics. Neither of the responding paramedics recalled seeing a gun near Love.

The Defendant Officers all testified that Love fired the gun only once. Sharon and Mathes-Rothfuss described hearing two separate volleys of shots, with the second shorter one occurring close in time to the first.

Benitez was taken to Northwestern Hospital, where emergency room doctors treated him. Benitez sustained a soft tissue gunshot wound to his left thigh, with the entrance wound on the outer front of the thigh and the exit wound on the inner back of the thigh. Doctors did not remove the bullet fragments found in Benitez's leg, and evidence technicians did not take any photographs of Benitez's wounds. Instead, the record contains pictures of Benitez's wounds that he took as he recovered. Evidence technicians did not collect Benitez's uniform or any other physical evidence from him while he was at the hospital. A tactical response report submitted in Benitez's name in the early morning hours of July 22, 2016 indicated that his injury was self-inflicted. The report also noted that Love fired first and also had a self-inflicted injury. Benitez later testified that he did not write the report, and the supervisor comments included in the report note that Love's shot struck Benitez and make no mention of a self-inflicted wound.

Paramedics also transported Love to Northwestern Hospital, where he was later pronounced dead. His body was then transported to the Office of the Cook County Medical Examiner for an autopsy, conducted by Dr. Eric Eason. During the autopsy, Dr. Eason collected a blood sample and a buccal swab. Dr. Eason made the following findings with respect to Love's injuries: (a) a penetrating gunshot wound entered the right back, passed through soft tissue and muscle, fractured portions of the ribs and caused a laceration of the right lung before the bullet lodged in the upper right chest (injury #4); (b) a gunshot wound entered the right back and a bullet lodged in the skin of the right chest (injury #5); (c) a gunshot wound entered the left thigh and a bullet lodged in the thigh (injury #6); (d) two gunshot wounds to the right arm

appeared to be from a bullet that fragmented into two pieces, fractured the right humerus, and lodged in the muscles of the right arm (injury #7); (e) two gunshot wounds of entry on the rear left forearm that passed through skin, tissue, and bones of the left forearm caused fractures before exiting the front of the left forearm (injury #8); (f) a gunshot wound entered the left abdomen, fractured, and lodged in the skin and subcutaneous tissue of the right abdomen (injury #9); (g) a gunshot wound entered the right lower abdomen, passed through skin and subcutaneous tissue, and exited the right abdomen (injury #10); (h) two small fragment gunshot wounds entered the right buttock and passed through the skin and subcutaneous tissue of the buttocks, with one fragment recovered (injury #11). Dr. Eason opined that Love died from multiple gunshot wounds, and he identified injuries #4 and 5 as potentially acutely lethal. Toxicology testing found ethanol in Love's system and a blood alcohol content of 0.115.

Evidence Technicians John Heneghan and Jerry Dosckocz processed the scene on July 21, 2016. They recovered a blue steel Fabrique Nationale Browning 9 mm semi-automatic handgun with a wood grip (the "Browning handgun") from the area north of the fence where Love collapsed. The Browning handgun is an antique handgun made during World War II. Photographs taken of the Browning handgun at the scene show the hammer in the cocked position, a necessary step to load a bullet into the firing chamber before pulling the trigger. Heneghan recorded a live cartridge with a firing pin strike mark in the chamber of the Browning handgun, meaning that the gun did not expel a bullet at least once upon the pulling of the trigger. The evidence technicians also collected swabs from the grip, trigger, and slide of the Browning handgun.

Heneghan and Dosckocz recovered fifteen fired cartridge cases, one live round of ammunition, and a metal fragment or bullet jacket from the scene. Heneghan and Doskocz also

inventoried the Defendant Officers' firearms. When unloaded, Herrera's gun had twelve live rounds of ammunition, four fewer than capacity, indicating that he fired three rounds and had one live round jam in the gun, which he then cleared without being fired. The evidence technicians found a black cellphone on the ground between the bench and the fence, as well as another black cellphone in a bag on the bench. When evidence technicians returned the following day after a strong rainstorm occurred the prior evening, they recovered three additional discharged cartridge cases.

Jon Flaskamp, a forensic scientist in the area of firearms and toolmark identification at the Illinois State Police ("ISP") Forensic Science Center, examined the discharged cartridge cases, the fired bullets recovered during Love's autopsy, the Browning handgun, and the Defendant Officers' guns. Of the recovered eighteen fired cartridge cases, he found that Herrera fired two, Benitez fired eight, and Rivera fired eight. Flaskamp concluded that Rivera's gun fired the projectiles from injuries #4 and 6, while Herrera's gun fired the projectiles from injuries #5, 7, and 9. He further determined that the fragments from injuries #7, 9, and 11 were not fired from Benitez's gun or the Browning handgun, but he could not determine whether they came from Herrera's or Rivera's guns. None of the projectiles or fragments recovered during Love's autopsy that Flaskamp examined came from Benitez's gun. Additionally, none of the projectiles, fragments, or fired cartridge cases Flaskamp examined came from the Browning handgun. And when Flaskamp test fired the Browning handgun, the slide did not close fully, so he had to manually help it forward. And when he fired another test shot, the next cartridge case became pinned in the ejection port.

Evidence Technician Chris Skarupinski used an ISP Gunshot Residue Collection Kit to collect samples from Love's hands at Northwestern Hospital and submitted the kit to the ISP

Forensic Science Center for testing. Forensic scientist Scott Rochowicz analyzed the gunshot residue collection kit, finding and confirming two tri-component particles on the right-hand sample and no tri-component particles on the left-hand sample. ISP protocols require three tri-component particles to opine that a subject was in the environment of a discharged firearm. Nonetheless, Rochowicz testified that in his training and experience, the two tri-component particles found on Love's right hand are only found in primer gunshot residue from the discharge of a firearm and in some vehicle airbag deployments. He also testified that the FBI would report a positive gun shot residue finding with the presence of only one tri-component particle.

Jamie Lynn Edwards, an ISP fingerprint specialist, did not find any latent prints suitable for comparison purposes on the Browning handgun, its magazine, or the ammunition recovered from it. She also testified that she did not observe biological material on the Browning handgun. Bode Laboratory tested and analyzed swabs collected from the grip, trigger, and slide of the Browning handgun, as well as the blood and buccal swabs collected from Love. The laboratory obtained a partial male DNA profile from the Browning handgun swabs, which matched the DNA profile generated from Love's blood. The probability of randomly selecting an unrelated individual with this partial DNA profile is at least 1 in 12 septillion in the U.S. population. But Love's sisters and mother all testified that, to their knowledge, Love did not own a gun and they had never seen him with one. And his sister Floresia testified that when Love left his mother's house before going to the park on the day of the shooting, he did not have a gun on him.

Plaintiff's experts, David Balash and William Harmening, identified the ammunition found in the Browning handgun as full metal jacket ball ammunition. According to them, such ammunition does not usually splinter or fragment when it hits soft tissue, instead needing to hit a hard object in order to splinter and leave behind fragments. Balash and Harmening opined that

10

hollow point bullets, like those the Defendant Officers had in their weapons, are designed to expand on impact and often leave fragments in wound paths. They further opined that the ragged edges of the entry and exit wound scars reflected in pictures of Benitez's wound suggested the wounds were made by bullet fragments and not full jacketed bullets fired directly into soft tissue. But Balash acknowledged that a damaged full jacketed bullet could have caused Benitez's wound.

Additionally, the first time Balash test fired the Browning handgun, he did not have issues, but the second time he did so, an issue arose with the cartridge after firing. According to Balash, a muzzle flash, like that Herrera claimed to see, only occurs if a cartridge is fired in the chamber of a weapon and the bullet leaves the muzzle. If a firearm misfires so that the cartridge does not ignite, no muzzle flash occurs. Harmening opined that bullet casings eject from guns in predictable patterns and most likely do not move substantially from where they land, especially when they land in grass, even if it is raining or windy outside.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). In response, the non-

11

moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

## ANALYSIS

### I.    Excessive Force

The Defendant Officers argue that the Court should grant them summary judgment on the excessive force claim because their actions did not violate the Fourth Amendment or, alternatively, because qualified immunity protects them. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (citation omitted) (internal quotation marks omitted). "In other words, qualified immunity 'shields from liability police officers who act in ways they reasonably believe to be lawful.'" *Ewell v. Toney*, 853 F.3d 911, 919 (7th Cir. 2017) (quoting *Jewett v. Anders*, 521 F.3d 818, 822 (7th Cir. 2008)). Once raised by the defendant, "a plaintiff must show (1) that the defendant violated a constitutional right, and (2) that the right was clearly established at the time so that it would have been clear to a reasonable officer that her conduct was unlawful in the situation." *Id.*

The Fourth Amendment's prohibition on unreasonable seizures limits an officer's use of deadly force. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). To determine the reasonableness of the use of force, the Court reviews the totality of the circumstances and "engage[s] in 'a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Weinmann v. McClone*, 787 F.3d 444, 448 (7th Cir. 2015) (quoting *Graham v. Connor*, 490 U.S. 386, 395–96 (1989)). When balancing these competing factors, the Court considers "the facts and circumstances of each particular case," *id.* (citation omitted), and evaluates reasonableness from the "perspective of a reasonable officer on the scene," not with "20/20" hindsight, *Graham*, 490 U.S. at 396. Therefore, the Defendant Officers' subjective motivations and hindsight explanations are not relevant. *See Horton*, 883 F.3d at 950 ("The actual officer's subjective beliefs and motivations are irrelevant."); *id.* at 952 ("[E]ven if Pobjecky subjectively did not intend to prevent Michael from escaping by shooting him, that does not mean it was objectively unreasonable to shoot Michael to prevent him from escaping.").

In deadly force cases, the Court must "consider[ ] whether a reasonable officer in the circumstances would have probable cause to believe that the suspect poses an immediate threat to the safety of the officers or others." *Sanzone v. Gray*, 884 F.3d 736, 740 (7th Cir. 2018). "If the person of interest threatens the officer with a weapon, deadly force may be used, because the risk of serious physical harm to the officer has been shown." *King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 985 (7th Cir. 2020). But "[h]aving a weapon is not the same thing as threatening to use a weapon." *Est. of Biegert v. Molitor*, 968 F.3d 693, 700 (7th Cir. 2020). And once the threat passes, an officer no longer retains the right to shoot. *See Horton*, 883 F.3d at 950 ("Even though an officer may in one moment confront circumstances in which he could constitutionally

13

use deadly force, that does not necessarily mean he may still constitutionally use deadly force the next moment."); *Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) ("When an officer faces a situation in which he could justifiably shoot, he does not retain the right to shoot at any time thereafter with impunity."). Thus, in order to assess the reasonableness of the Defendant Officers' actions, the Court must separately analyze the initial shots fired by all three Defendant Officers and the final shot fired by Herrera.

### A. Initial Shots

The Defendant Officers argue that the circumstances known to them at the time of the shooting made their decision to use deadly force objectively reasonable. The Defendant Officers rely on their testimony that Love pulled out a gun, pointed it at each one of them, and then fired a shot at Benitez, prompting them to fire back. If the Court accepts this version of the events, the Defendant Officers' use of deadly force complied with the Fourth Amendment. *See King*, 954 F.3d at 985 (finding officers reasonably used deadly force when man "pointed a large knife at them, disregarded their repeated commands to drop the knife, and then charged at [an officer]"); *Sanzone*, 884 F.3d at 740 (finding that because the suspect "raised his arm, gun in hand" towards the officers, the officer did not violate the Fourth Amendment by using deadly force); *Weinmann*, 787 F.3d at 449–50 ("[I]f [the suspect] had the gun raised to his shoulder and pointed at [the officer], then [the officer] would have been justified in using deadly force.").

The Administrator responds, however, that the record calls into question the Defendant Officers' credibility. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder."). Specifically, the Administrator contends that the Defendant Officers' initial reports differ from their subsequent

14

testimony and that possible collusion occurred, as the Defendant Officers admitted to discussing the case with each other before their depositions and attended each other's depositions. Further, the Administrator contends that the evidence does not support the fact that Love had a gun or, even if he did, that he fired it at Benitez. In other words, she maintains that Love posed no threat to the Defendant Officers, making their use of force unreasonable. *See Weinmann*, 787 F.3d at 448 (a suspect "has a constitutional right not to be shot on sight if he did not put anyone else in imminent danger or attempt to resist arrest for a serious crime").

"To ensure fairness to a deceased plaintiff . . . , given the impossibility of victim testimony to rebut the officers' account, we scrutinize all the evidence to determine whether the officers' story is consistent with other known facts. If physical evidence contradicts the [Defendant Officers'] testimony, summary judgment is likely inappropriate." *King*, 954 F.3d at 985. "Nevertheless, [the Administrator] as the party opposing summary judgment retains the burden of presenting evidence that creates a dispute of material fact for a finder of fact to resolve." *Est. of Green v. City of Indianapolis*, 854 F. App'x 740, 746 (7th Cir. 2021); *see also Muhammed v. City of Chicago*, 316 F.3d 680, 683–84 (7th Cir. 2002) (to preclude summary judgment in deadly force case, plaintiff must "provide specific evidence when attacking [officers'] credibility, such as contradictory eyewitness accounts or other impeachment evidence").

The Administrator argues that at least a question of fact exists as to whether Love possessed a gun and shot it at Benitez. The Administrator does not dispute that officers recovered the Browning handgun near Love's body and that the laboratory identified his DNA on it. But the Administrator points to other evidence that she claims could lead a reasonable juror to conclude that the Defendant Officers planted the Browning handgun: Love's family's

testimony that they did not know him to own a gun, the Defendant Officers' incorrect descriptions of the color of the gun and varying descriptions of how he pulled out the gun, the lack of fingerprints on the gun and gunshot residue on Love's hands, the lack of casings and bullets from the Browning handgun at the scene, and a lack of connection between Benitez's injuries and the Browning handgun. The Court addresses the effect of these alleged disputed facts in turn.

Initially, the Administrator points to testimony from Love's mother and sisters that they did not know him to own a gun and had never seen him with one, in addition to Love's sister's testimony that when he left his mother's house that day, he did not have a gun with him. But Love's family members did not see him in the park, and so their testimony cannot create a dispute of fact as to whether he posed a threat to the Defendant Officers. *See Holmes v. Hernandez*, 560 F. Supp. 3d 1177, 1190 (N.D. Ill. 2021) ("It is true that if a person testifies that he did not see something, and the undisputed facts show that he had no way to observe it, then the testimony of non-observation is of little to no value. So if someone was 20 blocks away from Washington Park and said that he did not see Johnson holding a gun, then that person's observation (if it can even be called that) has zero evidentiary weight in establishing a genuine dispute on whether Johnson was armed." (citation omitted)). Instead, the eyewitness testimony that does exist supports the Defendant Officers' account that Love pointed a gun at the Defendant Officers. Both Sharon and Mathes-Rothfuss testified that they saw Love raise or point his hand toward the Defendant Officers, with Sharon further testifying that she saw Love take something out of his backpack and point it at them. And while Mathes-Rothfuss testified he did not see Love holding anything, he also indicated that he had an obstructed view. *See Ybarra v. City of Chicago*, 946 F.3d 975, 980 (7th Cir. 2020) (noting that "[t]o the extent that the

[witnesses] could not hear the warnings, their testimony that they 'did not *hear* any warnings fails to present a question of material fact as to whether the giving of the warnings was feasible and if in fact they were given'" where officers positively testified that they gave a warning (quoting *Ford v. Childers*, 855 F.2d 1271, 1276 (7th Cir. 1988))).  Regardless of whether Love had something in his hand, both of these witnesses observed Love pointing at the Defendant Officers, which supports and does not undermine the Defendant Officers' account of the incident.

      The Administrator nonetheless speculates that Love could have had a black cellphone, instead of a gun, in his hand and so the Defendant Officers should not have perceived Love to pose a threat.  Rivera testified that Love held a blue steel black handgun, while Benitez and Herrera identified the gun in Love's hands as black.  The Administrator points out that the Browning handgun is blue steel with a wood grip,[4] suggesting that the Defendant Officers confused a gun with the black cellphone that evidence technicians later recovered in the grass between the bench and the fence.  Any dispute about the color of the gun is immaterial, however.  Even assuming that, as the Administrator contends, Love did not have a gun but rather a cellphone in his hand, that would not be enough to avoid summary judgment.  The reasonableness determination depends not on whether Love actually pointed a gun at the Defendant Officers or actually shot Benitez but rather on whether a reasonable officer in the Defendant Officers' shoes "would have *probable cause to believe*" that Love pointed a gun at them.  *Sanzone*, 884 F.3d at 740 (emphasis added); *Cooper v. City of Rockford*, No. 06 C 50124, 2010 WL 3034181, at *4 (N.D. Ill. Aug. 3, 2010) ("Whether the officer was ultimately correct

---

[4] The bluing of steel is a process to protect guns from rusting by using a black oxide coating, "named after the blue-black appearance of the resulting protective finish."  "Bluing (steel)," Wikipedia, https://en.wikipedia.org/wiki/Bluing_(steel) (last visited Sept. 20, 2023); *see also* "Bluing," Oxford Dictionaries, https://premium.oxforddictionaries.com/us/definition/american_english/bluing (last visited Sept. 20, 2023) ("A grayish-blue finish on metal produced by heating.").

that a suspect threatened him with a weapon is irrelevant so long as the officer 'reasonably believed' it was so." (quoting *Sherrod v. Berry*, 856 F.2d 802, 807 (7th Cir. 1988))).  Nothing in the record undermines the Defendant Officers' testimony that they believed the object that Love pointed at them was a gun.  *See Cooper*, 2010 WL 3034181, at \*9 (finding officer's use of deadly force reasonable where decedent "pretended to threaten [the officer] with a gun"); *Mcknight v. Taylor*, 210 F. Supp. 3d 1069, 1074 (S.D. Ind. Sept. 28, 2016) ("[B]ecause our focus here is on the reasonableness of Officer Taylor's *belief* that McKnight possessed a gun on the porch, the issues surrounding McKnight's actual possession of it are immaterial.").

Next, the Administrator argues that the Defendant Officers testified inconsistently about how Love allegedly pulled out his gun.  During their depositions, the Defendant Officers described Love reaching behind his back and pulling out a gun, while their statements to IPRA included reaching over his bag (Herrera), into the bag (Benitez), and into the small of his back (Rivera) to produce the gun.  The Court does not find these minor inconsistencies material, however.  *See Henning v. O'Leary*, 477 F.3d 492, 496 (7th Cir. 2007) ("[M]inor inconsistencies are not unusual—indeed exact, step by step recall of this incident by three different officers would be unusual."); *Tom v. Voida*, 963 F.2d 952, 961 (7th Cir. 1992) ("To the extent that there are minor ambiguities in Voida's statements, these ambiguities do not relieve the plaintiff of the burden of presenting affirmative evidence to support her case.").  Regardless of how Love pulled out his gun, all three of the Defendant Officers testified consistently that they saw Love with a gun and that he pointed the gun at all of them in a fanning motion, moving from one to the next and then back the other way.  *Est. of Pero v. Cnty. of Ashland*, No. 20-cv-984, 2022 WL 93425, at \*14 (W.D. Wis. Jan. 10, 2022) (granting defendant's motion for summary judgment in deadly force case where plaintiff only pointed to minor inconsistencies in the officer's statements

18

regarding the incident but "lack[ed] sufficient evidence from which a reasonable jury could conclude that [the suspect] did not lunge at [the officer] with the knife prior to each gunshot"). And the witnesses, again, support this testimony, with Sharon testifying that she saw Love with something in his hand and pointing at the Defendant Officers.

As to Love's handling of the gun that day, the Administrator notes that despite Love's injuries, the Browning handgun supposedly found underneath Love's body only had a minute amount of biological matter containing DNA, which produced only a partial DNA profile. The Browning handgun admittedly also had no suitable prints for comparison, and the gunshot residue analysis report indicated that Love may not have discharged a firearm. The lack of fingerprints or gunshot residue does not create a question of fact, however: "no evidence is no evidence. It is not affirmative evidence that contradicts the [O]fficers' testimony." *King*, 954 F.3d at 986; *see also Logan v. City of S. Bend*, 564 F. Supp. 3d 719, 729 (N.D. Ind. 2021) ("The court proceeds on what evidence exists, not on what doesn't exist."), *aff'd*, 50 F.4th 614 (7th Cir. 2022). Specifically, the Seventh Circuit has found that because "successful development of latent prints on firearms is difficult to achieve" and "very few identifiable latent prints are found on firearms," § 1983 plaintiffs in deadly force cases "cannot make anything of the lack of fingerprint evidence." *King*, 954 F.3d at 986 (citation omitted); *see also United States v. Wilson*, 303 F. App'x 350, 353–54 (7th Cir. 2008) (rejecting contention that the absence of fingerprints on a blue steel gun casts doubt on the reliability of the officers' version of events, noting the evidence technician's testimony that "the absence of prints on the gun was not unusual due to the firearm's blue steel finish that acted as a retardant to water: the predominant substance of which fingerprints are comprised"). And the Court finds the equivocal conclusion regarding the lack of gunshot residue similarly uninstructive. *See* Doc. 196-51 at 2 ("Derek Love *may* not have

discharged a firearm with either hand. If Derek Love did discharge a firearm, then the particles were removed by activity, were not deposited, or were not detected by the procedure." (emphasis added)). Instead, the physical evidence that does exist shows a match between the DNA found on the Browning handgun and Love, supporting the Defendant Officers' version of the events.

But the Administrator further argues that no physical evidence ties Benitez's injury to a bullet from Love's gun, calling into question whether Love actually shot Benitez. The Administrator first points to the fact that none of the shell casings or spent bullets in the park came from the Browning handgun, that the Browning handgun had a live round with a noticeable firing pin strike mark when recovered by evidence technicians, and that the hammer was in a cocked position when recovered, which means a live bullet had been loaded into the firing chamber but the trigger had not been pulled. Next, the Administrator argues that no one collected or analyzed bullet fragments from Benitez's wound, Benitez's uniform, or other physical evidence so as to rule out a self-inflicted close range shot. The Administrator's expert also opined that the photographs of Benitez's wounds suggested they were made by hollow point bullets like those used by the Defendant Officers and not the Browning handgun or by a bullet hitting something before entering Benitez's leg. And while Benitez denied completing the report himself, the Administrator notes that the Tactical Response Report filed in his name indicates in at least one spot that his injury was self-inflicted. But all of these facts would only allow a jury to improperly speculate about whether Love actually fired a gun. *See Biegert*, 968 F.3d at 701 ("We must draw inferences in the estate's favor but 'our favor toward the nonmoving party does not extend to drawing [i]nferences that are supported by only speculation or conjecture.'" (alteration in original) (citation omitted)); *Logan*, 564 F. Supp. 3d at 733 ("The Estate's argument [regarding a lack of fingerprints on the knife] does nothing more than invite

20

speculation whether [the suspect] was holding the knife, but the law won't permit juries to speculate.").

More importantly, as discussed above, whether Love actually fired the Browning handgun or even possessed the handgun does not matter. Regardless of whether Love shot Benitez, Benitez shot himself, or another Defendant Officer caused Benitez's injury, the relevant question remains whether the Defendant Officers reasonably believed that Love posed a threat to them. *See Cooper*, 2010 WL 3034181, at *4 ("Whether the officer was ultimately correct that a suspect threatened him with a weapon is irrelevant so long as the officer 'reasonably believed' it was so." (quoting *Sherrod*, 856 F.2d at 807)). In other words, while the Administrator has identified disputes of fact, none of these disputes is material. *See id.* ("On plaintiff's excessive force claim, a genuine issue of material fact is created only if plaintiff can put forth more than a scintilla of evidence that no reasonable officer in DeVleiger's position could have believed that Cooper threatened him with a weapon."). Here, none of the physical evidence regarding Benitez's wound or the firing of the gun creates a material question of fact as to whether the Defendant Officers reasonably believed that Love threatened them with the gun. Again, the evidence of record on that question shows that, given the split-seconds in which the Defendant Officers made the decision to shoot at Love, they acted reasonably to ensure their own safety from the perceived threat that Love posed, a decision made particularly acute upon hearing a gunshot and seeing Benitez fall to the ground wounded. *See Graham*, 490 U.S. at 396–97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."); *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003) ("[T]he fourth amendment does not require second-guessing if

21

a reasonable officer making decisions under uncertainty and the press of time would have perceived a need to act.").

Finally, the Administrator argues that the Defendant Officers continued firing at Love after he turned away and no longer posed a threat. The Administrator points to the fact that Love had a gunshot wound tied to a bullet from Rivera's gun that traveled from Love's back to the front, which the medical examiner described as "acutely lethal." Doc. 196-13 at 92:7–10. When added to the fact that evidence technicians found two bullet casings matching Rivera's weapon near the back wall of the park the day after the shooting, the Administrator theorizes that Rivera continued shooting at Love after Love turned his back on them. The Administrator notes that this contradicts Rivera's testimony that he stopped firing and lowered his weapon when he observed Love running toward the fence. Given the fast evolution of events, with the Defendant Officers testifying that they returned fire in rapid succession after Love pointed his gun at them and shot Benitez, a jury could not find that Rivera acted unreasonably in continuing to shoot at Love. *See Horton*, 883 F.3d at 950 ("[W]e must refuse to view the events through hindsight's distorting lens. We must consider the totality of the circumstances, including the pressures of time and duress, and the need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." (citations omitted) (internal quotation marks omitted)). A reasonable officer in Rivera's position could have believed that Love continued to pose a threat to the officers and others at the time Rivera fired his shots in rapid succession, with some of those shots striking Love in the back. *See id.* at 952 ("[T]he goals of self-defense and defense of

22

others remained valid even after Michael crawled past Pobjecky because for all a reasonable officer could have known Michael could have turned and produced a gun in a flash given all the facts and circumstances."). Moreover, with Love still having a gun in his hand when running toward the fence, a reasonable officer in Rivera's position could justifiably shoot to prevent Love from escaping, even if Rivera "subjectively did not intend to prevent [Love] from escaping by shooting him." *Horton*, 883 F.3d at 952; *see also Ybarra*, 946 F.3d at 980 ("Their use of deadly force to prevent escape continued to be reasonable even as Cruz drove past the officers."); *Ellis*, 999 F.2d at 247 ("If Ellis had threatened the officer with a weapon and then run off with the weapon, a reasonable officer in Wynalda's place could believe that Ellis created a danger to the community.").

Ultimately, the Administrator has failed to demonstrate that the record contains sufficient evidence that tends to discredit the Defendant Officers' version of events and permits a rational factfinder to find in her favor. Instead, she "offers 'only speculation or conjecture' that raises a 'metaphysical doubt,'" which provides "no job for the factfinder to perform." *Id.* (citation omitted). Because the undisputed facts demonstrate that Love posed an immediate threat to the Defendant Officers, the Court finds the Defendant Officers' initial use of deadly force objectively reasonable. *See, e.g.*, *Sanzone*, 884 F.3d at 740–41 (reversing denial of summary judgment to defendant officers where the record demonstrated that the suspect "threatened the officers when he pointed a gun at them"); *Weinmann*, 787 F.3d at 449–50 ("[I]f [the suspect] had the gun raised to his shoulder and pointed at [the officer], then [the officer] would have been justified in using deadly force."); *Conley-Eaglebear v. Miller*, No. 16-3065, 2017 WL 7116973, at *2 (7th Cir. Sept. 26, 2017) (finding that "[b]ecause [the officer] saw [the suspect] draw a gun and begin to point it in his direction, he acted reasonably under the circumstances" by shooting

23

the suspect).  Thus, the Court grants summary judgment for the Defendant Officers on this aspect

of the Administrator's excessive force claim.[5]

### B.     Herrera's Final Shot

Turning to the final shot Herrera took when Love lay on the ground on the opposite side

of the fence, Herrera argues that this use of force was also objectively reasonable.  The Court

must look at this use of force separately because, "[e]ven though an officer may in one moment

confront circumstances in which he could constitutionally use deadly force, that does not

necessarily mean he may still constitutionally use deadly force the next moment."  *Horton*, 883

F.3d at 950.

Herrera relies on his testimony that, despite Love lying on the ground, Love had the gun

in his right hand and made movements to get up.  The Administrator argues that Love could not

pose a threat at this point.  Initially, the fact that Love laid facedown on the ground does not

necessarily mean he posed no further threat.  *See Doxtator v. O'Brien*, 39 F.4th 852, 862 (7th

Cir. 2022) ("[B]eing on one's stomach on the ground does not preclude one from firing a gun, so

the fact that he was facedown on the ground and handcuffed does not render him 'subdued,'

especially if officers believed that one of his hands contained a firearm.").  Although the

Administrator argues that Love could not have gotten up given the extent of his injuries at that

time, this amounts to mere speculation.  *See Cooper*, 2010 WL 3034181, at *5 ("Plaintiff has not

provided a witness who could testify to the medical conclusions that should be drawn from the

autopsy report, and without some further evidence, the fact finder is left only to speculate about

how a bullet travels through a body and what that trajectory might say about how Cooper was

---

[5] The Defendant Officers also argue that Benitez did not seize Love because the evidence does not show that any of his discharged bullets struck Love.  Because the Court concludes that the Administrator has not identified a genuine issue of fact as to the reasonableness of the Defendant Officers' use of deadly force, the Court need not reach this argument.

shot.").  Nothing in the record contradicts Herrera's testimony that he saw Love holding the gun in his hand and making movements to get up.  *See Henning*, 477 F.3d at 496 ("Police officers cannot be expected to wait until a resisting arrestee has a firm grip on a deadly weapon and completely freed himself from officers trying to subdue him before taking action to ensure their safety."); *cf. Est. of Logan v. City of S. Bend*, 50 F.4th 614, 615 (7th Cir. 2022) ("Disbelief of the only witness is not proof that the opposite of the witness's statements is true; disbelief would mean that the record is empty, and on an empty record the plaintiff loses, because the plaintiff has the burdens of production and persuasion.").  Thus, the record only allows for the inference that Herrera's use of deadly force was objectively reasonable.[6]  *See Shirley v. Rabensteine*, No. 22-2147, 2023 WL 129432, at *2 (7th Cir. Jan. 9, 2023) (use of deadly force reasonable where, "even if Shirley was unconscious after he fell, the officers' unrebutted testimony that he continued thrashing on the ground suggests that a reasonable officer would perceive that Shirley was still resisting arrest").

## II.  *Monell* Claim

The City has moved for summary judgment on the Administrator's *Monell* claim, arguing among other things that the *Monell* claim cannot succeed because no underlying constitutional violation occurred.  Indeed, in a typical case, a plaintiff cannot prevail on a *Monell* claim without first establishing an underlying constitutional violation.  *Swanigan v. City of Chicago*, 775 F.3d 953, 962 (7th Cir. 2015) ("If the plaintiff fails to prove a violation of his constitutional rights in his claim against the individual defendants, there will be no viable *Monell* claim based on the same allegations.").  The Administrator argues, however, that the Seventh Circuit has recognized that "a municipality can be held liable under *Monell*, even when its officers are not, unless such a

---

[6] Because the Court finds that the Defendant Officers acted reasonably and thus did not violate the Constitution, it need not address the parties' remaining arguments regarding qualified immunity.

finding would create an *inconsistent* verdict." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010). To determine whether the City's liability depends on that of its officers, the Court looks to "the nature of the constitutional violation, the theory of municipal liability, and the defenses set forth." *Id.*

Here, the Administrator premises her *Monell* claim on allegations that the City allowed excessive force to occur through its policies of: failing to adequately train its officers on the use of force; failing to adequately investigate and discipline its officers; and allowing a "code of silence" to exist in the Chicago Police Department. Unlike in *Thomas*, the alleged City policies did not independently cause the harm; rather, the harm arose because of the Defendant Officers' actions. Thus, the Administrator can only hold the City liable if the Defendant Officers are first found liable. *See Doxtator*, 39 F.4th at 864 ("[A] failure to train theory or a failure to institute a municipal policy theory requires a finding that the individual officers are liable on the underlying substantive claim." (quoting *Tesch v. Cnty. of Green Lake*, 157 F.3d 465, 477 (7th Cir. 1998))); *Sallenger v. City of Springfield*, 630 F.3d 499, 504 (7th Cir. 2010) ("[A] municipality cannot be liable under *Monell* [for failure to train] where there is no underlying constitutional violation by a municipal employee."); *Veal v. Kachiroubas*, No. 12 C 8342, 2014 WL 321708, at *3 (N.D. Ill. Jan. 29, 2014) ("[E]ven if the absence of policy may be the source of the violation of civil rights, there is no injury to Veal without officer misconduct."); *Taylor v. Kachiroubas*, Nos. 12 C 8321, 12 C 8349, 2013 WL 6050492, at *4 (N.D. Ill. Nov. 15, 2013) ("Here, however, the actions of the individual officers in collecting and fabricating evidence against Sharp and Taylor are the source of the alleged harm to the plaintiffs, and any 'policy' exerted harm through those actions, not independently of them."). And although municipal liability may be possible absent individual liability where qualified immunity protects the Defendant Officers, *see Thomas*, 604

26

F.3d at 304–05, here, the Court has found no constitutional violation and so this exception does not come into play. Therefore, because no underlying constitutional violation occurred, the Court grants the City's motion for summary judgment on the *Monell* claim.[7] *See Outley v. City of Chicago*, 354 F. Supp. 3d 847, 872 (N.D. Ill. 2019) (finding that the municipality "cannot be liable under *Monell* since [the plaintiff] has not presented evidence from which a reasonable jury could conclude that he suffered a constitutional injury").

### III. State Law Claims

The Administrator also brings wrongful death and survival claims for willful and wanton conduct against the Defendant Officers and the City. The Defendant Officers and the City have separately moved for summary judgment on these claims.

#### A. Against the Defendant Officers

Illinois law allows an officer to use deadly force if:

> (i) he reasonably believes, based on the totality of the circumstances, that such force is necessary to prevent death or great bodily harm to himself or such other person; or (ii) when he reasonably believes, based on the totality of the circumstances, both that:
>
>> (1) Such force is necessary to prevent the arrest from being defeated by resistance or escape and the officer reasonably believes that the person to be arrested is likely to cause great bodily harm to another; and
>>
>> (2) The person to be arrested committed or attempted a forcible felony which involves the infliction or threatened infliction of great bodily harm or is attempting to escape by use of a deadly weapon, or otherwise indicates that he will endanger human life or inflict great bodily harm unless arrested without delay.

720 Ill. Comp. Stat. 5/7-5. The Illinois Tort Immunity Act provides that a "public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or

---

[7] Given the lack of an underlying constitutional violation, the Court does not address the City's other arguments on the viability of the Administrator's *Monell* claim.

omission constitutes willful and wanton conduct." 745 Ill. Comp. Stat. 10/2-202. To establish willful or wanton conduct, the Administrator must show that the Defendant Officers acted "without legal justification." *Wilson v. City of Chicago*, 758 F.3d 875, 880 (7th Cir. 2014).

The Defendant Officers argue that the Administrator's state law claims against them fail for the same reasons as the Administrator's Fourth Amendment claims. Indeed, courts in the Seventh Circuit have looked to the Fourth Amendment excessive force analysis in deciding survival and wrongful death claims under Illinois state law. *See Ybarra*, 946 F.3d at 981 n.1 ("For the same reasons that the officers' use of deadly force was reasonable as a matter of law, a jury could not conclude that their use of deadly force was willful and wanton."); *Muhammed*, 316 F.3d at 683 ("Thus, [under the Fourth Amendment analysis], 'when an officer believes that a suspect's actions [place] him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force.' The same rule applies to Muhammed's wrongful death claim under Illinois law." (quoting *Sherrod*, 856 F.2d at 805) (second alteration in original)); *Childs v. City of Chicago*, No. 13-CV-7541, 2017 WL 1151049, at *10 (N.D. Ill. Mar. 28, 2017) ("[T]he plaintiff's survival and wrongful death claims depend on Childs' ability to recover under the Fourth Amendment through § 1983."). Because the Court has concluded that the Administrator cannot prevail on her Fourth Amendment excessive force claim, she similarly cannot prevail on her state law wrongful death and survival claims against the Defendant Officers. *See Horton*, 883 F.3d at 954 ("The district court correctly concluded that since Pobjecky's actions were objectively reasonable, they cannot be willful and wanton, so Defendants were entitled to immunity, and the state-law claims failed."); *Lampkins v. Jones*, No. 10 CV 7993, 2014 WL 12621565, at *4 (N.D. Ill. Nov. 4, 2014) ("A finding that a police officer's use of deadly force was reasonable due to the imminent

danger of death or serious bodily injury to himself or others has been found to foreclose actions based on both the Fourth Amendment and the Illinois Wrongful Death Act.").

### B.      Against the City

The Administrator brings state law claims against the City directly and based on *respondeat superior*. The Administrator's *respondeat superior* claims, which seek to hold the City liable for the acts of the Defendant Officers, fail because the evidence does not provide a basis for holding the Defendant Officers liable, as discussed above. 745 Ill. Comp. Stat. 10/2-109 ("A local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable."). But the Administrator also seeks to recover directly against the City for its alleged failure to implement, adhere to, and train its officers on a use of force continuum consistent with that used by law enforcement agencies in Illinois. The City moved for summary judgment on the direct liability claims, arguing that the evidence did not support a finding that the City failed to implement policies and training on a use of force continuum consistent with other Illinois law enforcement agencies, that Section 2-201 of the Illinois Tort Immunity Act barred the claims, and that, to the extent the Defendant Officers may be liable, the direct claims against the City were duplicative of the *respondeat superior* claims. The Administrator failed to respond to any of these arguments or otherwise address the direct state law claims against the City, focusing solely on the *respondeat superior* claim.[8] By failing to respond, the Administrator has conceded that her direct state law claims against the City fail. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an

---

[8] The Administrator did discuss the failure to train with respect to her *Monell* claim, but she nowhere addressed how the evidence regarding the City's alleged failure to train applied to her direct state law claims against the City.

argument . . . results in waiver.").  Therefore, the Court grants summary judgment for the City on the Administrator's state law claims against the City.[9]

**CONCLUSION**

For the foregoing reasons, the Court grants the Defendant Officers' and the City's motions for summary judgment [195, 205].  The Court denies the parties' *Daubert* motions [228, 229, 230, 231, 232] without prejudice as moot.  The Court enters judgment for the Defendant Officers and the City and terminates this case.

Dated: September 25, 2023

SARA L. ELLIS
United States District Judge

---

[9] Because the Court grants the Defendant Officers' and the City's motions for summary judgment on all of the Administrator's claims, the Court denies the parties' *Daubert* motions without prejudice as moot.